U.S. v. Fallon Good morning. May I please the court? My name is Robert Epstein. I'm here today on behalf of the appellant, Mr. James Fallon. With the court's permission, I'd like to request five minutes of my time for a question. Thank you, Your Honor. The issue on this appeal concerns the district court's award of restitution in the amount of $57,000, which the district court imposed despite the fact that it was undisputed below that the quote-unquote victim here made more than $500,000 of profit as a result. Yeah, but not on these particular machines. No. Respectfully, Your Honor, on these machines, the case here... Well, with respect to these particular clients? Yes, Your Honor. This case involves... Four? Well, the case here involved not just the four machines. It involved 78 machines. Right. The fraud here that the government alleged went to all 78 machines, not simply to four of them. The government's theory was that the victim, ADL Leasing Company, would not have gone into business with Mr. Fallon, but for the fraudulent letter that was provided to the victim. So in looking at the amount of loss here or profit, what we have to do is to look at the entire transaction. ADL purchased... Let's start by looking at it in terms of the remand, because as you well know, this is the second time. Actually, you could say technically it's the third time this case has been before the court, because it's in relationship to Leahy. But what, in light of the remand, should have taken place before the district court? And by that, I mean, how was the burden-shifting actually supposed to work here? Because I'm assuming you're maintaining that the district court did not appropriately follow what the remand was suggesting. Yes, Your Honor, we are. And the remand that this court issued was for a new restitution hearing. And obviously... You got that, didn't you? That's correct. And what we alleged in that new restitution hearing that was undisputed from the government was that there was no total loss here, that the victim profited from its transaction with Mr. Fallon. Shouldn't the... You're arguing that we should not consider, the trial's court should not consider the fact that the victim profited less because of a fraud than he otherwise would have arguably, absent a fraud. Correct, Your Honor, because as this court stated in the United States v. Quillen, restitution must be pegged to actual losses. Right. Not to unrealized profits, but to losses. But if you can establish as a matter of fact that the loss includes money that, even though they made some money, they made less money because of fraud than otherwise they would have made. I look at Quillen again, I don't read it as saying that we have to ignore the fact that there is a loss, a loss defined not as a net loss, but a loss meaning less money than otherwise would have been realized because of the fraud. But under the statute, under this court's case law, under every single circuit's case law, a victim cannot recover because they made less than they were expecting to make If they made more than zero, there is no restitution. And I think we need to take a step back and look, what did, what happened in this case? ABL purchased 78 microdermabrasors for $25,000 each. That comes out to about $1.95 million. The question then becomes, for purposes of loss, for restitution, did they get that amount back when they leased out the machines that they purchased from Mr. Fallon? It is undisputed that they did. Not only did they get that amount back, they got more than $500,000 in interest from the doctors that they leased these machines to. Under those circumstances, there is no loss in the case. This is a fraud, a case of fraud without loss. The government, when the government asserts that what the district court did here was correct, that the district court can focus on only four of the leases and disregard the other 70-plus leases, the other 70-plus machines that ABL purchased, the government has no support for that either as a matter of fact in this case, as a matter of case law, or as a matter of common sense. This is not a case where, when what the government tries to assert in its brief is that this would be a case, what the government is asserting is, as if ABL purchased 74 machines from Mr. Fallon, no fraud, and then they only decided to purchase the four they're focusing on because of some fraud that occurred with respect to those four. That's simply not this case. That we understand. Are you, I'm sorry. Was there any attempt made at the restitution when the district court operates from a  And I know there's an issue here about whose obligation this was burdened with. But was there any attempt made to bring in the people who were still out there that you could get a hold of, who would turn the machines and have them testify that they didn't bring it in because of the fraud, they brought it in because of some other reason? As to the four machines that the government was focused on, no. The government took the position, those were the only four that were due, quote unquote, to Mr. Fallon's fraud. The other 74 were not. And what was wrong with the government's proof in that respect regarding those four? Well, with respect to issue one, nothing. We're not asserting that anything was. What we're asserting is that you couldn't disregard the other 74 machines. Let him finish his question. I'm sorry, Your Honor. You've asked it many times and it's frequently. Let's assume that we don't agree with your position, as I think aptly characterized by Judge McKee, that it's a kind of net loss that you're arguing here. Let's assume we don't agree with that. Now, why, when we look at these four specific transactions, was the government's proof inadequate in any way? First of all, they did get the benefit of the presumption as stated by our Fallon 1 opinion. Did they not? Yes, Your Honor. All right. Where does that move the ball? Whose burden does it become to do what at that point? Okay. Well, if we're assuming that issue one is out for the moment and we move on to issue two, and then it becomes the defense burden, which we met here, I would submit, by asserting that ABL had a right to enforce their leases as to these four doctors. That they had a clear legal right to enforce them. And then... And at that point, the burden shifts back to the government. Yes. All right. So how does the government fail at that stage? The government fails because they're unable to show that the doctors who leased these feet, a lawsuit that ABL could have brought. Their position was the doctors had a claim of fraudulent inducement and therefore they were not obligated to make good on their lease payments. We showed that's simply not the case. There was no material misstatement to these doctors that were made because the product, nine days after this fraudulent letter that was provided to ABL, nine days later... You said preclearance is unnecessary. Right. So the letter becomes moot at that point and none of the leases were entered into... You're saying the letter can't be material at that point? It could be material to ABL, and that's why Mr. Fallon was convicted, but it cannot be material... To the downstream... To the downstream lessees because by the point they're leasing the product, the product has been exempted by congressional statute. The letter is moot at that point. The letter... The government is arguing that it was a reasonable decision, reasonable business decision, not to attempt to enforce the leases based upon the high water clause. That's just clearly mistaken because there is no possible fraudulent inducement claim on the part of the doctors. There's no material misrepresentation. There is no misrepresentation that's even made by ABL, at least no knowing misrepresentation, because their position is we never knew about this. We were the ones who were defrauded by Fallon. So ABL makes no knowing misrepresentation. Any misrepresentation that was made is not material in light of the congressional statute that was passed nine days... Enacted, came into effect nine days after the letter. There's no possible fraudulent inducement claim. The cause of loss with respect to just those four machines is not Mr. Fallon. It's the fact that ABL sat on its rights, and the government has no response to that. What should ABL have done? What do you mean they sat on their rights? ABL could have brought civil actions against these four doctors to make good on their leases. They had a perfect legal right. The government's response on page 26. They say that your argument simply... Rather, you summarily state that ABL was obligated to take action against the defaulting lessees. The argument is clearly incorrect. It would impose on a victim the obligation to undertake legal action to recover losses before the wrongdoer would be obligated to pay. And then, surprisingly, the government says, understandably, Fallon cannot cite any authority for that troublesome proposition. That's exactly what we said in Fallon 1. That's exactly right. This court said in Fallon 1 that the district court should consider the enforceability of the leases. The district court failed to do that. The enforceability or the fact that no civil action was pursued. Those are different. The enforceability and the abstract as opposed to an affirmative action to take someone to court. What this court said in Fallon 1 was that this district court should consider the enforceability of the outstanding lease contracts when calculating the appropriate amount of restitution. Whether the doctors may have colorable fraudulent inducement claims is far from certain, this court said, because as this court recognized, on February 19th, 1998, prior to the start date of any of the leases, Dermappeal, Mr. Fallon's company, was exempted from all preclearance requirements. So this court seemed to recognize in Fallon 1 that the doctors would not have a colorable fraudulent inducement claim and encouraged, directed the district court to consider the issue of whether ABL could have enforced these leases against the doctors. Thank you very much. Thank you. Back on rebuttal. Mr. McKeown. I'm not sure whether it's morning or afternoon, but good morning or good afternoon. As a colleague of mine would say, it's afternoon. She actually said evening somewhere, so don't worry about it. May it please the court, my name is Bernadette McKeown, and I am representing the AFL-E United States of America in this matter. I would like to start by answering the question posed by Judge Smith as to the government's proof as to these four leases. Was there anything wrong with the government's proof? And I submit to you that no, there was not. The government met its burden of proof of showing that the losses associated with these four leases was approximately and directly caused by Mr. Fallon's actions. Doesn't that ignore the enforceability of a lease? With respect to the enforceability argument, Your Honor, I would suggest that this court did direct the district court to consider the enforceability whether or not there was a colorable fraudulent inducement claim. And you called that around last year. I guess I know how it works unless it's changed. Whoever wrote the brief referred to that as a troublesome proposition. It may be, but it's one that you're stuck with. Well, if I could elaborate on that a little. The district court did exactly what this court asked, and it did consider whether or not there was a colorable fraudulent inducement claim and that the ADL's decision not to seek enforcement of these leases was a reasonable decision. And the court concluded that it was. Now, there was testimony in the record on which the court considered. There were two witnesses at trial who testified. They were either the direct purchasers or from the offices of the purchasers who said that they would not have purchased these devices had they known that they had not been FDA approved. Then there was the testimony of ADL's attorney who testified that it was his recommendation to the board of directors that they not seek to enforce these leases because they were concerned about fraudulent inducement claims, that this would be an expensive proposition. Why isn't that tantamount to a waiver of any right to go after restitution for those things? I mean, he says it's an expensive proposition. He certainly knows the lay of that land better than I. But it almost looks like a confessed judgment case. You've got this incredibly tight clause in the lease. You've got leases that were signed after the date that arguably was material to the lessees that they would have to argue they relied upon the fraudulent letter. They'd have to argue they relied upon that letter even though at the time they entered the lease, the misrepresentation in the letter was irrelevant. You combine that with ironclad hell or high water language. Why isn't this tantamount to a confession of judgment? I don't think it is a confession of judgment, Your Honor. I think that Judge Giles' analysis was the correct one, that they were put in this position because of Mr. Fallon's fraud. They were put in a position of making a business decision that was a tough business decision. Once they make the business decision, why shouldn't they have to live with it? If they say, look, we're not going to pursue the restitution. Because I think that's not the law on restitution. It doesn't place on the victim the burden of undertaking every possible option, whether they're questionable, whether it's going to relieve in anything. We're not saying they have to do everything conceivable. They don't have to go hire somebody to extort the money out of these four lessees. But we did say the government is correct. So it sounds as though in Fallon 1, the government even conceded that the enforceability had to be considered. And the court did just that, and I think the court's decision was the proper one, that it was a reasonable decision not to pursue these. They were placed in a position of either not being able to enforce them or at least... That's my point, though. Why shouldn't they have to live with that decision? Because we stated... Because the victim's losses... Whether the doctors may have a colorable fraudulent inducement claim is far from certain. So we seem to flag on lead man that there's a real problem with enforcing these claims. And the court did consider the issue. It considered the evidence in the record, and its conclusion was a very reasonable and sound one, that in this situation, given these facts, that ABL was justified in concluding that it would not be a good business decision to pursue these, and that they would not be viable claims. Let me try it this way. In the restitution cases, we talk about how the loss has to be the direct result of the criminal activity. Given this really unique situation, and maybe this is stretching it to a point, but this thought just occurred to me. In this context, why wouldn't the loss be not a direct result of the fraud, but you have an intervening cause, if you will, and I use tort language, but it's a direct result of ABL's decision not to pursue the contractual rights. Why would that be an inappropriate way, given the causation and the nexus that has to flow for restitution? Why would that be wrong? I think that inappropriately shifts the burden to the victim. And the whole point of the MVRA and the whole point of restitution is to make the victim whole for their losses. The victim shouldn't be placed in that position. The defendant who causes the losses. It flows from the illegal activity. That's what we have to make them whole for. It has to be a direct consequence. This court already decided that there was a presumption that the losses were caused by Mr. Fallon's fraud. And the fact that ABL did not pursue litigation against these particular doctors was a reasonable and sound business decision. It is not an intervening cause that obviates his responsibility for this fraud. And I would suggest, I mean, in many cases, Your Honors, I'm sure are aware that with restitution awards, there's also sometimes civil actions going on. Certain victims do take actions against them. That doesn't mean that the defendant who caused the fraud is therefore not liable because there's a civil action. There will be an offset down the road. The victim is not going to recover twice. But in my experience, it's happened very frequently where I'm seeking restitution and there's a civil lawsuit filed against that same victim. And that will all be worked down the road. But it does not relieve the defendant of the responsibility for his actions. Were all these leases entered into after the date of the congressional election? My understanding, Your Honor, and I'm new to this case, is yes, they were. However, I will say that, and this is in a footnote in Fallon 1, that while there was that congressional action, these leases were entered into sometime, it was almost contemporaneous in time, in February of 1998. It wasn't until December of 1998 that a letter was sent to Fallon telling him that his devices had been exempted. So I'm not sure when the world at large had knowledge that this situation had changed. But on the materiality issue, I think there's a very important point there. It cannot be considered immaterial as a matter of law because the fact that the law had changed, if the purchasers had known that the manufacturer of this device had gone so far as to fabricate and submit a false letter from the FDA, they may have decided they didn't want anything to do with him, whether the law had changed or not. So that is a material fact that those purchasers were entitled to know. It's not just the change in status. It's the fact that there was a fraud committed. That's the purchasers, but that's ABL, right? No, I'm talking about the ultimate purchasers of the equipment. They did not know. And I think it would have been very material to their decision-making process, too. So as a matter of law, it's certainly not immaterial. It seems so far afield. They never dealt with Fallon. They dealt with ABL. They didn't even deal with ABL. They dealt with salesmen who were associated with Fallon. They were the finance company. They weren't out there marketing it. They weren't selling it. That's the whole problem with the return of property argument, was the doctors were dealing with salesmen who had an association with Fallon and not with ABL. And there's testimony in the record of that. Agent Loveland testified at the sentence hearing that that was the way the system worked. So, no, they did not deal directly with ABL. Do you think the district court properly made a specific enough finding of the enforceability or the lack of enforceability of the leases? I do, Your Honor. I believe that that is sufficient because he found that there was, if there was not, I think his conclusion that it was not necessary for him to find that ultimately that ABL would prevail, but that there was a colorable claim and that their decision not to pursue the litigation was a sound and reasonable business judgment considering that there was fraud. I mean, just the goodwill alone. Let me ask an embarrassing question. Irrespective of the directive from our court about looking into the enforceability of the leases, does the statute specify that this is a proper consideration in these circumstances or was this just something peculiar to this case? The statute provides, I don't think the statute specifically addresses this situation. Certainly it comes into play because of the unequivocal directive that it has to be proximately and directly related to the fraud. Exactly. Right. So it's not, there's an offset provision for return property, but there's nothing specifically on point as to this issue. This just comes into play as to whether or not he directly and proximately caused this loss and whether he should be held responsible for this loss, whether that is a separate consideration that takes it out of that arena. And I submit that it's not. That the victim should not be placed in the position of having to undertake costly and questionable litigation to recover losses that are directly attributable to this individual. And that's not the law. There's no authority for it. There's no cases for that that support that position. And the government submits it. It just shouldn't be the law. Would your honors like me to address any other issue? Sounds like you really want to. If you have no further questions. The two of you speak more rapidly than any two attorneys I've ever seen. I speak so quickly, but you both speak faster than I can think. We've been waiting a long time. That's why. We've been slowing down the tape. We're playing them publicly. Anything further, your honors? Thank you very much. Mr. Epstein. Thank you. I will try to slow down a bit. I don't think you can. I've never seen it. I'm going to give it my best shot. The government began by saying the two witnesses at trial testified that the doctors would not have purchased the product if they had known that it was not FDA approved. First of all, those were not. Those were ABL people. I understand your point, but I'm not sure you need to respond to it. Those weren't from the doctor's offices of the four. Doctors that are in question here. Point one. Point two is the product. They said they wouldn't have purchased the product if it wasn't FDA approved, but when they did lease the product, it was FDA approved. The statute had effectively given FDA approval. The statute exempted the product and all others like it. They marketed it before the approval. Is that correct? Not to any of the lessees. I believe they did. I believe the independent sales team, that was not Fallon salesmen. They were independent sales force. I believe they began marketing it before the February 19th effective date of the statute. None of the leases in question here were entered into prior to that effective date though. While it may be that some doctors out there wouldn't have bought the product if it wasn't FDA approved, that wasn't a problem with respect to their leases because it had been cleared by the FDA by the point of the start date of the leases. The government repeatedly says this was a reasonable, reasonable business decision, but how is that so on the part of ABL not to enforce the leases when under the elements of a fraudulent inducement claim, the doctors clearly lose? This is a very unique case that we have here, and I think that's why we have the type of remand with the direction that this court gave. Directing the court to consider the enforceability of the leases because we have a fraud here that nine days after that fraudulent letter was provided to ABL, the fraudulent letter was effectively made moot by virtue of the statute. I think that's why this court directed the district court to consider couldn't ABL have simply enforced these leases because as to the doctors who leased the fraud, the fraudulent letter had been rendered moot by virtue of the statute. It gets messy because these are future customers and you want to sue them under at best questionable circumstances, if not fraudulent circumstances. So it was a tough issue for the district court to decide. Yes, but the district court never found, I believe Your Honor asked the district court found that the lessees would have had a colorable claim here. The district court never found that. The district court simply found that ABL was put in the position of having to make a business decision. Well, if they made the wrong decision, clearly wrong under the law, that's not Mr. Fallon's responsibility and he's not the cause of the loss. How do you determine clearly wrong under the law? That's the problem. You're going to have, my guess is you'll have reputable and competent lawyers on both sides of this issue. Well, I wouldn't think so, Your Honor. Not in this case, not with respect to these facts and the law fraudulently induced. Should we remand it back to the district court? Oh, I don't think you need to, Your Honor. Why not? I would urge the court not to. I think it's clear on the law that ABL had a right to enforce these leases. I think that's 100% clear under the law. But what if they said they had a claim? I can't say they had a right. Well, they had a claim. And when the government says the doctors could have asserted a defense of fraudulent inducement, it's simply then not there under these facts. The doctors had no colorable fraudulent inducement claim. What do we do with what we said in Fallon 1 that there is a presumption of loss arising from the fraudulent conduct? If you are right, then don't we basically unwrite what we wrote in Fallon 1 about there being a presumption of loss? No, I don't think so, Your Honor. I think the presumption applies. And then I think one of the things the district court needed to consider in determining whether that presumption applies or is overridden by the defense is whether or not these leases were enforceable on the part of ABL. We said two different things. We said there's a presumption of loss arising from the fraud. And then in our remand order, we said that the district court should consider the enforceability of the outstanding lease contracts in calculating the appropriate amount of the restitution. But that doesn't negate what we said about all losses being derived from the fraud. Right. But there's a presumption. But if the leases are enforceable, then the presumption is overcome. And I think that's what we showed here, and that's why I believe the presumption was overcome as to these four leases. I assume my time is up. I would urge the court, though, on Issue 1 to consider what this court said in this point. Restitution has to be pegged to actual losses. And the whole purpose of the statute is to make the victim whole, put him back to where he was without the fraud. Now, if the fraud here had not occurred, then ABL, by its own testimony, would not have gone into business with Mr. Fallon. They would not have provided him the $1.9 million for the machines. So the point here of restitution is to get ABL back that $1.9 million. Well, that already occurred here. They got back the $1.9 million as a result of leasing Fallon's product, plus a whole lot more. So I would submit we never even should have got to the issue of Issue 2, because under Issue 1, they did not suffer a loss. Thank you. You didn't slow down. I was wrong. Thank you very much. We thank both counsels for a helpful argument. We'll take the matter under review.